**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NICHOLAS DeFLAMINIS and LINDA DeFLAMINIS, Individually, and on Behalf of All Other Similarly Situated Individuals,<br><br>Plaintiffs,<br><br>v.<br><br>COVENANT HEALTH, INC.,<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Nicholas DeFlaminis and Linda DeFlaminis ("Plaintiffs"), by and through their undersigned counsel, individually, and on behalf of a class of all others similarly situated (the "Class"), files this Class Action Complaint against Defendant Covenant Health, Inc. ("Covenant" or "Defendant"). Plaintiffs' allegations are made based upon personal knowledge as to them and their own acts, and upon information and belief and investigation of counsel, as to all other matters.

## SUMMARY OF THE CASE

1. Plaintiffs bring this class action on behalf of consumers ("Class Members") whose personal information ("Personally Identifiable Information" or "PII") and protected health information ("Protected Health Information" or "PHI") (collectively, "Private Information"), as a result of Defendant's failure to implement adequate data security measures.

2. The data breach compromised Private Information, including Plaintiffs' and the Class' names, addresses, dates of birth, medical record numbers, Social Security numbers, as well

as medical information concerning treatment information such as diagnoses, dates of treatment and types of treatment, and health insurance information.[1]

3. On or about May 18, 2025, an unauthorized actor accessed Defendant's network and systems and exfiltrated Plaintiffs' and Class Members' Private Information; then on or about May 26, 2025, Defendant "was alerted to unusual activity in [its] Information Technology ('IT') environment" (the "Data Breach").[2] As set forth herein, Defendant failed to comply with industry standards to protect information systems that contain Private Information.

4. Defendant operates a regional network of hospitals, nursing and rehabilitation centers, assisted living facilities, and community-based health and elder care providers serving communities in New England and parts of Pennsylvania.[3]

5. In order to obtain Defendant's services, Plaintiffs and the Class were required to directly entrust Covenant with their Private Information, which Covenant uses in order to perform their regular business services.

6. As a healthcare provider, Covenant knew, or should have known, that they had an obligation to protect the Private Information of their patients, and thus had a duty to secure such information from unauthorized access and exfiltration.

7. Despite Covenant's duty to safeguard the Private Information of its current and previous patients, and/or their family members and its employees, Plaintiffs' and Class Members' Private Information.

---

[1] *See Notice of Data Security Incident*, COVENANT HEALTH, https://covenanthealth.net/cybersecurity/ [https://perma.cc/9NMK-X4HE] (last visited Jan. 14, 2026).

[2] *Id.*

[3] *Who We Are*, COVENANT HEALTH, https://covenanthealth.net/who-we-are/ [https://perma.cc/BY2X-CCNR] (last visited Jan. 14, 2026).

8. Despite learning of the Data Breach in May 2025, Covenant did not begin notifying various state agencies until July 2025 and did not fully notify impacted individuals of the unauthorized access until December 2025.[4]

9. On or about December 31, 2025, Defendant began sending individualized notice letters ("Notice") to victims of the Data Breach.[5]

10. Upon information and belief, the data breach occurred in part because Covenant stored Plaintiffs' and Class Members' Private Information in an unencrypted, internet-accessible environment, and as result of the Data Breach, is now available on the dark web.

11. Upon information and belief, due to Defendant's negligence, cybercriminals have accessed and obtained everything they need to commit identity theft and wreak havoc on the personal lives of thousands of individuals, including Plaintiffs.

12. Defendant knowingly obtained Plaintiffs' and Class Members' sensitive Private Information and had a resulting duty to securely maintain that information in confidence. Plaintiffs and Class Members would not have provided their Private Information to Defendant if they had known that Defendant would not ensure that it used adequate security measures.

13. By taking possession and control of Plaintiffs' and Class Members' Private Information, Defendant assumed a duty to securely store and protect it.

14. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiffs' and Class Members' Private Information is now exposed to cybercriminals.

---

[4] Security Breach Notifications, OFF. OF THE N.H. ATT'Y GEN., https://mm.nh.gov/files/uploads/doj/remote-docs/covenant-health-20251231.pdf (last visited Jan. 14, 2026).

[5] *Id.*

15. As a direct and proximate result of Covenant's negligent failure to implement reasonable data security measures, Plaintiffs' and Class Members' Private Information was exfiltrated and is now in the hands of cybercriminals.

16. Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their Private Information—risks which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

17. Plaintiffs bring claims for negligence, breach of implied contract, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the Private Information in Defendant's possession in order to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiffs and Class Members for their lifetimes.

## PARTIES

18. Plaintiffs Nicholas DeFlaminis and Linda DeFlaminis, at all relevant times, were and are citizens of the State of Maine and residents of the County of Penobscot.

19. Defendant is a Massachusetts corporation with its principal place of business located at 40 Shattuck Road, Suite 317, Andover, MA 01810.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because: (a) the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) the action is a class action; (c) there are Class

Members who are diverse from Defendant, namely Plaintiffs, citizens of Maine; and (d) there are more than 100 Class Members.

21. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

22. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and because Defendant resides in this District.

## FACTUAL ALLEGATIONS

23. Defendant is a group of catholic health care organizations that own and operate hospitals, clinics, and related medical facilities, and provide acute, primary, and specialty healthcare services to patients throughout communities in New England and parts of Pennsylvania.

24. As part of providing these healthcare services, Covenant is entrusted with sensitive personal information that their customers provide to it. Specifically, the sensitive Private Information that Plaintiffs and the proposed Class provided included, but is not limited to, *inter alia*, treatment information such as diagnoses, dates of treatment and types of treatment, and health insurance information, Social Security numbers, and/or other personal information.

25. When entrusting Covenant with their Private Information, Plaintiffs and Class Members reasonably expect Defendant would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

26. By obtaining, collecting, and storing Plaintiffs' and Class Members' Private Information, Covenant assumed equitable and legal duties to safeguard Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

27. Despite these duties, Covenant failed to implement reasonable data security measures to protect Plaintiffs' and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiffs' and Class Members' Private Information.

28. On or about May 18, 2025, an unauthorized individual accessed and exfiltrated Plaintiffs' and Class Members' sensitive Private Information.[6]

29. On or about December 31, 2025, Defendant sent Notice to those affected. The Notice states as follows:[7]

> **What Happened?** On December 10, 2025, through its ongoing extensive data analysis Covenant Health and its third-party forensic specialists determined your information may have been involved in a data security incident that occurred earlier this year. Covenant Health was alerted to unusual activity in our Information Technology ("IT") environment on May 26, 2025, and immediately worked to secure and restore our systems. We engaged industry-leading third-party information technology and forensic specialist to conduct a thorough investigation into the source and extent of the incident, including the amount and type of data that may have been affected. Through its investigation, we learned that an unauthorized party gained access to our IT environment on May 18, 2025, and was able to access some patient information.
>
> **What Information Was Involved?** The investigation determined that your information may have been obtained by an unauthorized party and mya have included your name, address, date of birth, medical record number, health insurance information, and/or treatment information, such as diagnoses, dates of treatment, and type of treatment.

30. Upon information and belief, the Data Breach occurred as a direct and proximate result of Covenant's intentional, willful, reckless, and/or negligent failure to implement and follow basic security procedures in order to protect their customers' Private Information. Indeed, had

---

[6] Security Breach Notifications, OFF. OF THE V.T. ATT'Y GEN., https://ago.vermont.gov/sites/ago/files/documents/2025-12-31%20Covenant%20Health%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited Jan. 15, 2026).

[7] *Id.*

Covenant properly maintained and monitored their computer systems that stored the Private Information, Defendant would have discovered the Data Breach sooner rather than allowing the cybercriminals unimpeded access to exfiltrate Plaintiffs' and Class Members' Private Information.

31. In any event, the scope of the Data Breach shows the severity of Covenant's data security failings. The cybercriminals were able to gain access to Covenant's patients' Private Information. If Covenant had even minimal data security measures in place, they would have been able to detect the Data Breach at a point before cybercriminals were able to successfully obtain their patients' data.

## I. THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE

32. Covenant was well aware that the protected Private Information which they acquired was highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

33. Covenant also knew that a breach of their computer systems, and exposure of the Private Information therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

34. These risks are not theoretical. Numerous high-profile breaches have occurred at companies such as Accellion, Aflac, Blackbaud, Change Healthcare, Fortra, Snowflake, Progress Software, amongst others, in recent years. These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

35. PII, PHI, and Private Information are valuable commodities to identity thieves. As the U.S. Federal Trade Commission ("FTC") recognizes, identity thieves can use this information

to commit an array of crimes including identity theft, and medical and financial fraud.[8] Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information and other protected financial information on multiple underground internet websites, commonly referred to as the "Dark Web."

36. Criminals often trade stolen Private Information on the "cyber black market" for years following a breach. Cybercriminals can also post stolen Private Information on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing 17 billion records. The United States, specifically, saw a 19.8% year-over-year increase in data breaches as compared to 2022.[9]

37. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.

38. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, healthcare fraud, tax fraud, credit and bank fraud, and more.

39. **Social Security Numbers**. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process

---

[8] *What To Know About Identity Theft*, FED. TRADE COMM'N, https://consumer.ftc.gov/articles/what-know-about-identity-theft [https://perma.cc/X776-APYC] (last visited Jan. 14, 2026).

[9] *2024 Global Threat Intelligence Report*, FLASHPOINT (2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

of doing so results in major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

40. The U.S. Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> You should know that other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new [Social Security number], you shouldn't use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information isn't associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit.[10]

41. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often, Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

---

[10] *Identify Theft and Your Social Security Numbers*, SOC. SEC. ADMIN. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf; *see also* Michele Lerner, *Identity Thieves Are After Your Children*, YAHOO! FIN. (Mar. 11, 2013), https://finance.yahoo.com/news/2013-03-11-identity-theft-children-prevention.html.

42. Based on the value to cybercriminals of the patient PII in its possession, Covenant knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. Covenant failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

43. On or about May 26, 2025, Covenant became aware of a cybersecurity event.[11]

44. After becoming aware of the Data Breach, Covenant launched an investigation into the breach, which determined that on May 18, 2025, an unauthorized third party gained access to Defendant's information technology environment and thereby accessed certain patient information.[12]

45. According to recent news reports, during the Data Breach, a threat actor gained access to its systems without authorization and obtained certain personal information of current and former patients and employees of Covenant.[13]

46. The information compromised during the Data Breach includes, at the very least, personal information provided to Covenant including names, addresses, dates of birth, medical record numbers, Social Security numbers, health insurance details, and treatment information, including diagnoses, dates of treatment, and types of treatment. [14]

---

11 *See supra* note 1.

12 *Id.*

13 Andrea Fox, *Covenant Health patient data breach numbers skyrocket*, HEALTHCARE IT NEWS (Jan. 5, 2026), https://www.healthcareitnews.com/news/covenant-health-patient-data-breach-numbers-skyrocket.

14 *Id.*

47. On or around December 31, 2025, nearly seven months after the Data Breach began, Covenant reported the Data Breach to the Office of the Maine Attorney General, indicating the Data Breach compromised the Private Information of 478,188 individuals.[15]

48. As set forth below, despite this threat, and other known threats, upon information and belief, Covenant failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

49. On or around the time Covenant notified Maine's Attorney General of the Data Breach, Plaintiffs received a notice informing them that their Private Information had been compromised during the Data Breach.

50. Upon information and belief, Class Members received similar notices informing them that their Private Information was compromised during the Data Breach.

51. The Data Breach occurred as a direct result of Covenant's failure to implement and follow basic security procedures

## II. COVENANT FAILED TO COMPLY WITH FTC GUIDELINES AND INDUSTRY BEST PRACTICES

52. Covenant is prohibited by the Federal Trade Commission Act of 1914, 15 U.S.C. §45 ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

---

[15] *Data Breach Notifications*, OFF. OF THE ME. ATT'Y GEN., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2637476a-ce93-46b9-a8c9-e2705955dc98.html [https://perma.cc/DGR6-7Q3R] (last visited Jan. 14, 2026).

53. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

54. The FTC recommends that businesses:

a. identify all connections to the computers where sensitive information is stored;

b. assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

---

16 *Start with Security – A Guide for Business*, FED. TRADE COMM'N (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

f. use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.[17]

---

[17] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 14, 2026).

55. The FTC further recommends businesses take additional cybersecurity steps, which include:

a. conducting an inventory of all company devices that store sensitive data, and understanding what types of PII are stored on those devices;

b. encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. crafting a data security plan that involves both physical security (e.g., locking up physical files) and electronic security, and training employees regarding the data security plan;

d. promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

e. developing a plan to handle a data breach or data security incident, if and when such an incident occurs.[18]

56. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

57. Covenant failed to properly implement one or more of the basic data security practices described above. Defendant's failure to employ reasonable and appropriate measures to

---

18 *Id.*

protect against unauthorized access to Private Information resulted in the unauthorized access to, and exfiltration of, Plaintiffs' and Class Members' Private Information.

58. Covenant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

59. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[19]

60. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[20] Upon information and belief, Covenant failed to adhere to the NIST guidance.

61. Defendant's failure to protect Plaintiffs' and Class Members' PII is a result of Covenant's failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices. This includes Covenant's failure to enable multi-factor authentication on employee accounts, one of the most basic cybersecurity features.

62. Covenant was, at all times, fully aware of its obligations to protect the PII of their customers because of their business model of collecting PII to provide their healthcare services. Covenant was also aware of the significant repercussions that would result from their failure to do so.

---

[19] *See Framework for Improving Critical Infrastructure Cybersecurity*, NIST, at Appendix A, Table 2 (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[20] *Id.* at Appendix A, Table 2 at 26–43.

## III. COVENANT'S FAILURE TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH

63. Covenant admits that an unauthorized third party accessed its Information Technology system.[21]

64. Covenant failed to take necessary precautions or employ adequate measures necessary to protect its computer systems against unauthorized access and keep Plaintiffs' and Class Members' Private Information secure.

65. The Private Information that Covenant allowed to be exposed in the Data Breach is the type of private information that Covenant knew, or should have known, would be the target of cyberattacks.

66. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[22] Covenant failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

67. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[23] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

---

[21] *See supra* note 1.

[22] Protecting Personal Information: A Guide for Business, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business [https://perma.cc/HA6Q-VZWJ].

[23] *Id.*

## IV. THE DATA BREACH'S INCLUSION OF PHI IS PARTICULARLY SIGNIFICANT

68. With respect to the Data Breach's implicating PHI, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[24]

69. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[25]

70. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[26]

71. Health information, in particular, is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[27]

72. As indicated by Jim Trainor, second-in-command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. 'Credit

---

24 *70% Of Data Involved In Healthcare Breaches Increases Risk Of Fraud*, DISTILINFO GOVHEALTH (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ [https://perma.cc/8FB9-GD87].

25 *Id.*

26 Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon [https://perma.cc/MXC7-245P].

27 *Id.*

cards can be, say, five dollars or more where PHI records can go from $20 say up to – we've even seen $60 or $70.'"[28]

73. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can **sell for up to $1,000 online**[.]"[29]

74. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity. The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[30]

75. As noted above, some of the information that was compromised in the Data Breach included, among other things, "medical record numbers and treatment information such as diagnoses, dates of treatment and type of treatment."[31] Accordingly, Plaintiffs and Class Members must remain especially vigilant given the highly sensitive nature of the PHI at issue in this Data Breach.

---

28 *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDEXPERTS (May 14, 2015), https://www.idx.us/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat [https://perma.cc/ASS8-NZK5].

29 *See supra* note 26 (emphasis in original).

30 Justin Klawans, *What is medical identity theft and how can you avoid it?*, THE WEEK (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid [https://perma.cc/JRB9-VREL].

31 *See supra* note 1.

## V. COVENANT IS SUBJECT TO HIPAA AS A COVERED ENTITY

76. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996, 45 C.F.R. §160.102 ("HIPAA"), and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

77. As a regular and necessary part of its business, Covenant collects and stores the highly sensitive PHI of its patients. Covenant is required under federal law to maintain the strictest confidentiality of the patients' PHI that it acquires, receives, and collects, and is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

78. In addition, Covenant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act of 2009 ("HITECH"). *See* 42 U.S.C. §17921; 45 C.F.R. §160.103.

79. HIPAA's Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information, while HIPAA's Security Standards for the Protection of Electronic Protected Health Information establishes national security standards for health information that is stored or transmitted electronically.

80. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. §164.302. Such health information includes "individually identifiable health information . . . that is (i) transmitted by electronic media; [and] (ii) maintained in electronic media." 45 C.F.R. §160.103.

81. HIPAA's Security Rule requires entities such as Covenant to, *inter alia*, do the following: (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

82. HIPAA also requires entities such as Covenant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. §164.306(e). Additionally, Covenant is required under HIPAA to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

83. Moreover, both HIPAA and HITECH required Covenant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated, but not permitted by, the privacy rules. *See* 45 C.F.R. §164.306(a)(1) and §164.306(a)(3); *see also* 42 U.S.C. §17902.

84. Finally, HIPAA requires an entity to provide notice of a data breach to affected individuals "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §§164.400–414.

85. Covenant was, at all times, aware of the mandates of HIPAA. Despite being aware of these mandates and its concomitant obligations, Covenant failed to comply with its obligations and protect the PHI of Plaintiffs and the Class Members.

86. Defendant's failure in this regard is especially egregious given that Defendant was fully aware of the breadth and depth of PHI it obtained and stored and the foreseeable consequences that would result from unauthorized disclosure of this information.

## VI. PLAINTIFFS AND CLASS MEMBERS SUFFERED DAMAGES

87. The ramifications of Covenant's failure to keep consumers' Private Information secure are long-lasting and severe. Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways, including theft of their Private Information as well as substantial and imminent risk of identity theft and fraud. Plaintiffs and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

88. In 2019, the U.S. Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[32] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the

[32] U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-230, DATA BREACHES: RANGE OF CONSUMER RISKS HIGHLIGHTS LIMITATIONS OF IDENTITY THEFT SERVICES (Mar. 2019), https://www.gao.gov/assets/gao-19-230.pdf.

consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiffs and Class Members) must take after a data breach, like Defendant's, are both time-consuming and of only limited and short-term effectiveness.

89. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (such as an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[33]

90. Further, once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

91. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[34]

92. For these reasons, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

---

[33] *See What To Do Right Away*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited Jan. 15, 2026).

[34] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, REPORT TO CONGRESSIONAL REQUESTERS 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

93. The value of Plaintiffs' and Class Members' Private Information has been diminished by its exposure in the Data Breach. Indeed, Private Information is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use it and trade the information on the cyber black market for years thereafter.[35]

94. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen Private Information can be used to carry out a variety of crimes.

95. Plaintiffs and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect their customers' Private Information.

96. As a result of Covenant's failures, Plaintiffs and Class Members face an increased risk of potential scams, identity theft and fraud, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

97. Plaintiffs and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers and cybercriminals.

## VII. PLAINTIFFS' EXPERIENCE

98. Plaintiffs were patients of Defendant. In order to be patients, Plaintiffs were required to entrust Covenant with their Private Information. In collecting and maintaining the Private Information of Plaintiffs, Defendant undertook a duty to act reasonably in its handling of

---

[35] Trustwave SpiderLabs, *The Price Cybercriminals Charge for Stolen Data*, LEVELBLUE (Aug. 3, 2022), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

Plaintiffs' Private Information. Covenant, however, did not take reasonable care of Plaintiffs' Private Information, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

99. On or about December 31, 2025, Plaintiffs each received a Notice of Data Breach Letter from Covenant. The Notice stated that their "information may have been involved in a data security incident." The Notice further stated that their "information may have been obtained by the unauthorized party and may have included [their] name, address, date of birth, medical record number, Social Security number, health insurance information, and/or treatment information, such as diagnoses, date of treatment, and type of treatment" and that their Private Information may have been exposed.

100. Since the announcement of the Data Breach, Plaintiffs have been required to spend their valuable time and effort taking steps to avoid potential scams and mitigate the risk of misuse of their Private Information. Specifically, Plaintiffs have been required to spend their valuable time and effort monitoring their accounts and changing passwords to their financial and personal accounts. Plaintiffs would not have had to engage in these time-intensive efforts but for the Data Breach.

101. Plaintiffs have suffered actual injury from having their Private Information exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent scammers accessing their accounts; (b) mitigation efforts to prevent the misuse of their Private Information; (c) damages to, and diminution of, the value of their Private Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (d) loss of privacy.

102. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiffs face a significant, present, and ongoing risk of scams, identity theft and fraud, and other identity-related fraud now and into the indefinite future.

103. In addition, knowing that hackers gained access to their Private Information and that this information likely has been and will be used in the future for scams, identity theft, fraud, and other nefarious purposes has caused Plaintiffs to experience significant frustration, anxiety, worry, stress, and fear.

104. In collecting and maintaining the Private Information of Plaintiffs, Defendant undertook a duty to act reasonably in its handling of Plaintiffs' Private Information. Covenant, however, did not take reasonable care of Plaintiffs' Private Information, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

## CLASS ALLEGATIONS

105. Plaintiffs, individually, and on behalf of all others similarly situated, bring this case pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Class defined as:

> All persons residing in the United States and its territories whose Private Information was compromised in the Data Breach and received Notice ("Class"):

106. Excluded from the proposed Class are Defendant, its subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

107. Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

108. **Numerosity**. The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class, and the identities of the individual members thereof, are ascertainable through Defendant's records including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises over a million individuals.

109. **Commonality**. This action involves questions of law and fact that are common to Plaintiffs and the Class Members. Such common questions include, but are not limited to:

- whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;
- whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' Private Information;
- whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;
- whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' Private Information;
- whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;
- whether Defendant breached their duties to exercise reasonable care in handling Plaintiffs' and Class Members' Private Information;
- whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and
- whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

110. **Typicality**. Plaintiffs' claims are typical of the claims of the Class Members. The claims of Plaintiffs and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their Private Information. Plaintiffs and Class Members entrusted Defendant with their Private Information, and it was subsequently accessed by an unauthorized third party.

111. **Adequacy of Representation**. Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the other Class Members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the proposed Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

112. **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the proposed Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

113. **Predominance**. Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example,

Defendant's liability and the fact of damages is common to Plaintiffs and each member of the proposed Class. If Defendant breached its duties and released Plaintiffs' and Class Members' Private Information, then each Plaintiff and each Class Member suffered damages by that conduct.

114. **Ascertainability**. Members of the proposed Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

115. Plaintiffs restate and reallege the above allegations above as if fully set forth herein.

116. Defendant's patients, including Plaintiffs and Class Members, provided their non-public Private Information to Defendant as a condition of obtaining services from Defendant.

117. Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII and PHI it collected from them as a condition of obtaining services from Covenant from being compromised, lost, stolen, accessed, and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in Covenant's possession were adequately secured and protected.

118. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

119. Defendant owed a duty of care to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

120. Defendant had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Covenant with their Private Information as a condition of obtaining services or employment was predicated on the understanding that Covenant would take adequate security precautions to protect their PII and PHI.

121. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

122. Plaintiffs and members of the Class entrusted Defendant with their PII and PHI with the understanding that Covenant would safeguard their information.

123. Defendant's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

124. Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

125. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its patients, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law, statutory, and other duties to Plaintiffs and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and

protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiffs' and Class Members' PII and PHI;

c. storing former patients' PII and PHI longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

126. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiffs' and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiffs and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

127. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

128. Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

129. Defendant had, and continues to have, duties to adequately disclose that the Private Information of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

130. Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

131. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

132. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

133. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII and PHI is used; (ii) the publication and/or theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Covenant fails to undertake appropriate and adequate measures to protect it; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives.

134. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

135. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

136. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

137. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to

further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

138. Plaintiffs and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

139. Plaintiffs restate and reallege the above allegations above as if fully set forth herein.

140. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

141. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI it obtained when providing healthcare services.

142. Plaintiffs and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

143. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over 50 enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

144. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

145. Furthermore, Defendant is a Covered Entity under HIPAA, which sets minimum federal standards for privacy and security of PHI. Pursuant to HIPAA, 42 U.S.C. §1320d *et seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class Members' electronic PHI.

146. Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI they create, receive, maintain, or transmit; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. §164.102 *et seq*.

147. HIPAA also requires Defendant to provide Plaintiffs and Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§164.400–414.

148. Defendant violated HIPAA by disclosing Plaintiffs' and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI; and by failing to provide Plaintiffs and Class Members with notification of the Data Breach without unreasonable delay after its discovery.

149. Plaintiffs and the Class Members are customers within the class of persons HIPAA was intended to protect.

150. Moreover, the harm that has occurred is the type of harm that HIPAA was intended to guard against.

151. Defendant's violation of HIPAA constitutes negligence *per se*.

152. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

153. Plaintiffs restate and reallege the above allegations above as if fully set forth herein.

154. In connection with obtaining services from Defendant, Plaintiffs and Class Members entered into implied contracts with Covenant.

155. Plaintiffs and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining services from Defendant.

156. Defendant solicited, offered, and invited Class Members to provide their Private Information in order to obtain services at Covenant. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

157. Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

158. When Plaintiffs and Class Members provided their PII and PHI to Covenant, either directly or indirectly, as a pre-condition for obtaining services, they entered into implied contracts with Covenant.

159. Pursuant to these implied contracts, in exchange for the consideration and PII and PHI provided by Plaintiffs and Class Members, Defendant agreed to, among other things, and Plaintiffs and Class Members understood that Covenant would: (1) provide employment or products and/or services to Plaintiffs and Class Members; (2) implement reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII and PHI; and (3)

protect Plaintiffs' and Class Members' PII and PHI in compliance with federal and state laws and regulations and industry standards.

160. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

161. Implicit in the agreement between Plaintiffs and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

162. The protection of PII and PHI was a material term of the implied contracts between Plaintiffs and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth herein, Defendant recognized its duty to provide adequate data security and ensure the privacy of its patients' PII and PHI with its practice of providing a privacy policy on its website.

163. Plaintiffs and Class Members performed their obligations under the implied contract when they provided Defendant with their PII and PHI.

164. Defendant breached its obligations under its implied contracts with Plaintiffs and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII and PHI, and in failing to implement and maintain security protocols and

procedures to protect Plaintiffs' and Class Members' PII and PHI in a manner that complies with applicable laws, regulations, and industry standards.

165. The mutual understanding and intent of Plaintiffs and Class Members, on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

166. On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

167. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

168. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

169. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

170. Importantly, Massachusetts law provides that every contract includes good faith and fair dealing between the parties involved.

171. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

172. Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of

Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach.

173. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

174. Defendant's breach of its obligations of its implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach and the injuries that Plaintiffs and Class Members have suffered from the Data Breach.

175. Plaintiffs and Class Members suffered by virtue of Defendant's breach of their implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII and PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII and PHI has been breached; (v) they were deprived of the value of their PII and PHI, for which there is a well-established national and international market; (vi) they have lost time and incurred expenses, and will incur future costs to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they have overpaid for the services they received without adequate data security.

176. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

177. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

178. As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

179. Plaintiffs restate and reallege the above allegations above as if fully set forth herein.

180. This Count is plead in the alternative to the breach of implied contract Count above.

181. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiffs and Class Members.

182. Plaintiffs and Class Members conferred a benefit on Defendant, whereby they provided their Private Information to Defendant to obtain services.

183. Defendant, prior to and at the time Plaintiffs and Class Members entrusted it with their PII and PHI, caused Plaintiffs and Class Members to reasonably believe that it would keep that Private Information secure.

184. The monies Defendant was paid in its ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

185. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to

it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

186. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein, before Plaintiffs and Class Members made their decisions to provide Defendant with their Private Information.

187. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

188. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Defendant was overpaid.

189. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

190. Plaintiffs and Class Members have no adequate remedy at law.

191. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly

increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

192. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

193. Plaintiffs restate and reallege the above allegations above as if fully set forth herein.

194. Under the Federal Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

195. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether Covenant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs alleges that Covenant's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

196. Pursuant to its authority under the Federal Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Covenant owes a legal duty to secure patients' Private Information and to timely notify impacted individuals of a data breach under the common law, HIPAA, and various state statutes; and

b. Covenant continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

197. This Court also should issue corresponding prospective injunctive relief requiring Covenant to employ adequate security protocols consistent with law and industry standards to protect Private Information in Covenant's data network.

198. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Covenant. The risk of another such breach is real, immediate, and substantial. If another breach at Covenant occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

199. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Covenant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Covenant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Covenant has a pre-existing legal obligation to employ such measures.

200. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Covenant, thus eliminating the additional injuries that would result to Plaintiffs and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for relief as follows:

A. For an Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C. For equitable relief enjoining Covenant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII and PHI, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

D. For equitable relief compelling Covenant to utilize appropriate methods and policies with respect to patient data collection, storage, and safety, and to disclose with specificity the types of PII and PHI compromised as a result of the Data Breach;

E. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Covenant's wrongful conduct;

F. Ordering Covenant to pay for not less than 10 years of credit monitoring services for Plaintiffs and Class Members;

G. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H. For an award of punitive damages, as allowable by law;

I. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J. Pre- and post-judgment interest on any amounts awarded; and

K. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims herein so triable.

Dated: January 20, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/ Joseph P. Guglielmo
Joseph P. Guglielmo (MA Bar No. 671410)
Ethan S. Binder (*Pro Hac Vice forthcoming*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, New York 10169
Ph: (212) 223-6444
Fx: (212) 223-6334
jguglielmo@scott-scott.com
ebinder@scott-scott.com

*Counsel for Plaintiffs and the Proposed Class*